**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Mark W. Mayer, Larry C. Welsh and Brandi Young, Individually, on Behalf of the Smurfit-Stone Container Corporation Savings Plan the Jefferson Smurfit Corporation Hourly Savings Plan the Smurfit-Stone Container Corporation Hourly Savings Plan, and St. Laurent Paperboard Hourly Savings Plan, and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>Administrative Committee of the Smurfit-Stone Container Corporation Retirement Plans, Patrick J. Moore, Paul K. Kaufman, Charles Hinrichs, Ron Hackney, and Brian Gardner,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 09 CV 02984

Hon. Virginia M. Kendall

Magistrate Judge Ashman


<u>JURY TRIAL DEMANDED</u>

**DEFENDANTS' ANSWER
TO PLAINITFFS' AMENDED COMPLAINT**

Defendants Administrative Committee of the Smurfit-Stone Container Corporation Retirement Plans, Patrick J. Moore, Paul K. Kaufman, Charles Hinrichs, Ron Hackney, and Brian Gardner ("Defendants"), by and through their attorneys, in answer to Plaintiffs' Amended Complaint ("Complaint"), state as follows:

<u>NATURE OF ACTION</u>

1.     Plaintiffs are Participants in the Plans. Plaintiffs bring this action pursuant to § 502(a)(2) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(2)and (3) [sic], as representatives of the Plans and, as necessary, on behalf of a class of all Participants in the Plans for whose individual accounts the Plans invested in the Smurfit-Stone Container Corporation ("SSCC") Common Stock Fund (the "Fund") from January 28, 2008 to the present (the "Class Period").

**ANSWER:**   Defendants admit Plaintiffs have brought a purported class action complaint against Defendants.   Defendants deny the remaining allegations contained in Paragraph 1.

2.     As more fully set forth below, Defendants breached their fiduciary duties owed to the Plans and the Participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor Regulations, 29 C.F.R. § 2550. As a result of these breaches, Defendants are liable to the Plans for all losses resulting from each such breach of fiduciary duty. Plaintiffs also seek equitable relief.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 2.

3.     Plaintiffs' claims arise out of the Plans' imprudent investment in the Fund.  The Plans' continued investment in the Fund was imprudent because the Fund was an excessively risky investment for retirement assets in light of the Company's dire and perilous financial condition, which included:

   a.     a deteriorating demand for containerboard and box products leading to plant closures, production decreases and employee lay-offs;

   b.     an inability to secure appropriate credit facilities;

   c.     an unprecedented drop in stock price;

   d.     an excessive increase in the Company's debt to equity ratio;

   e.     numerous downgrades of SSCC's credit and liquidity ratings; and,

   f.     an exorbitantly high debt-default and bankruptcy risk, including an Altman Z-score ("Z-score") – a financial formula commonly used by financial professionals to predict whether a company is likely to go bankrupt – which, throughout the Class Period, indicated that SSCC was on the verge of bankruptcy.

As a consequence of these excessive risks, Defendants' investment of Plan retirement assets in the Fund was imprudent during the Class Period.

**ANSWER:**   Defendants admit that towards the end of the alleged class period, there was a decrease in demand for containerboard and box products as well as plant closures, production decreases and employee lay-offs.  Defendants also admit that there were difficulties in securing appropriate credit facilities and a drop in the stock price.  Defendants further admit

that there were downgrades in the Company's credit and liquidity ratings. Defendants deny the

remaining allegations contained in Paragraph 3.

4.      Plaintiffs' claims also arise out of SSCC's misrepresentations and failures to disclose material adverse facts concerning the Company's business conditions, debt management and viability. In particular, Defendants knew or should have known that the Company failed to disclose material adverse information regarding significant problems concerning the company's debt management, including the difficulties that SSCC was experiencing in renewing its revolving credit facilities which were required for the company's day-to-day operations. Defendants also knew or should have known that the Company's transformation program aimed at decreasing debt and improving performance was actually failing. These improper activities artificially inflated the value of Fund and SSCC's stock shares and rendered investment in the Fund imprudent. Yet, throughout the Class Period, the Plans continued to invest in the Fund and the Fund continued to invest in SSCC stock.

**ANSWER:**      Defendants deny the allegations contained in Paragraph 4.

5.      As these risks increased to imprudent levels, Defendants did not take appropriate action to protect the Plans' assets invested in the Fund or the Fund's assets invested in SSCC stock. Ultimately, on January 26, 2009, when SSCC filed for bankruptcy under Chapter 11 of the Bankruptcy Code, the Fund's investment in SSCC stock was priced at pennies a share. As a result, the Plans and their participants suffered significant losses.

**ANSWER:**      Defendants admit that on or about January 26, 2009, SSCC filed for

Chapter 11 Bankruptcy protection.   Defendants deny the remaining allegations contained in

paragraph 5.

6.      Plaintiffs allege that it was imprudent to permit the Plans to invest in the Fund and the Fund to invest in SSCC stock during the Class Period because (a) the investment in the Fund was excessively risky and (b) the prices of shares of the Fund and Company stock were artificially inflated. Plaintiffs also allege that Defendants breached their fiduciary duties by negligently failing to disclose material information necessary for Participants to make informed decisions concerning the Plans' assets, benefits and investing in the Funds. Plaintiffs also allege that those Defendants who had a duty to appoint and monitor those fiduciaries with authority or control over the Plans' assets breached their duty to appoint and monitor, Finally, Plaintiffs allege that all Defendants are liable as co-fiduciaries.

**ANSWER:**      Defendants deny the allegations contained in Paragraph 6.

## JURISDICTION AND VENUE

7.      Plaintiffs' claims arise under and pursuant to ERISA § 502, 29 U.S.C. § 1132.

**ANSWER:**    Defendants admit that Plaintiffs purport to bring this lawsuit pursuant to

Section 502 of ERISA.  Defendants deny the remaining allegations contained in Paragraph 7.

8.      This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29
U.S.C. § 1132(e)(1).

**ANSWER:**    Defendants admit that this Court has subject matter jurisdiction over this

matter unless the U.S. Bankruptcy Court in Delaware extends the automatic stay to this case.

Defendants deny the remaining allegations contained in Paragraph 8.

9.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. §
1132(e)(2), because this is a District where the Plans were administered, where breaches of
fiduciary duty took place and/or where one or more Defendants reside or may be found.

**ANSWER:**    Defendants admit that venue is proper in this District based on the

allegations contained in the Amended Complaint.  Defendants deny the remaining allegations

contained in Paragraph 9.

## THE PARTIES

10.    **Plaintiff Mayer** is a resident of the state of Illinois. Plaintiff was a Participant in
the Smurfit-Stone Container Corporation Savings Plan at all times relevant to the Complaint and
maintained an investment in the Fund in his individual account in that Plan during the Class
Period.

**ANSWER:**    Defendants are without sufficient knowledge or information as to whether

Mayer is a resident of Illinois.  On information and belief, Defendants admit that Plaintiff Mayer

was a Participant in the Smurfit-Stone Container Corporation Savings Plan at all times relevant

to the Complaint.  Defendants deny the remaining allegations contained in Paragraph 10.

11.    **Plaintiff Welsh** is a resident of the state of Illinois. Plaintiff was a Participant in
the Smurfit-Stone Container Corp. Hourly Savings Plan at all times relevant to the Complaint
and maintained an investment in the Fund in his individual account in that Plan during the Class
Period.

**ANSWER:**     Defendants are without sufficient knowledge or information as to whether Plaintiff Welsh is a resident of Illinois.   On information and belief, Defendants admit the remaining allegations contained in Paragraph 11.

12.     **Plaintiff Young** is a resident of the state of Arkansas. Plaintiff was a Participant in Jefferson Smurfit Corporation Hourly Savings Plan at all times relevant to the Complaint and maintained an investment in the Fund in her individual account in that Plan during the Class Period.

**ANSWER:**     Defendants are without sufficient knowledge or information as to whether Plaintiff Young is a resident of Arkansas.   On information and belief, Defendants deny the remaining allegations contained in Paragraph 12.

13.     SSCC is the industry's leading integrated manufacturer of paperboard and paper-based packaging in North America, including containerboard and corrugated containers, and is one of the world's largest paper recyclers. SSCC is a Delaware corporation with its principal executive offices at 150 North Michigan Avenue, Chicago, Illinois. SSCC is a holding company that conducts its business operations through its wholly-owned subsidiary Smurfit-Stone Container Enterprises, Inc. ("SSCE"). SSCC is in bankruptcy and is not a named as a Defendant

**ANSWER:**     Defendants admit the allegations contained in Paragraph 13, except to clarify that its Chicago location recently moved to 222 N. LaSalle Street, Chicago, IL 60601.

14.     SSCE is the wholly-owned subsidiary of SSCC. SSCE is [sic] manufactures paperboard and paper-based packaging in North America, including containerboard and corrugated containers, multi-wall bags and coated recycled boxboard, and is one of the world's largest paper recyclers. In addition, the company has a complete line of graphics capabilities for packaging. SSCE is a Delaware corporation with its principal executive offices at 150 North Michigan Avenue, Chicago, Illinois. SSCE was the sponsor of each of the Plans. SSCE is in bankruptcy and is not named as a Defendant.

**ANSWER:**     Defendants admit the allegations contained in Paragraph 14, except to clarify that its Chicago location recently moved to 222 N. LaSalle Street, Chicago, IL 60601 and that SSCE does not currently manufacture multi-wall bags or coated recycled boxboard.

15.     **Defendant Administrative Committee of the Smurfit-Stone Container Corporation Retirement Plans ("SSCC Committee" or "Committee")** is the plan

administrator for the [sic] each of the Plans. As the Plan Administrator, the SSCC Committee was the "named" fiduciary for each of the Plans.

**ANSWER:**    Defendants admit that the SSCC Committee is the plan administrator for each of the Plans.  The remaining allegations contained in Paragraph 15 are legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny the remaining allegations contained in Paragraph 15.

16.    The members of the Administrative Committee were SSCC's highest ranking officers (CFO, Controller, Finance and HR) with the most comprehensive access to knowledge of and responsibility for SSCC's financial condition and immediate prospects. The Administrative Committee members received no separate compensation for their service on the Committee. On information and belief, service on the Administrative Committee was incident to the members' employment and corporate position.

**ANSWER:**    Defendants admit that during the alleged class period, the members of the Administrative Committee were Charles Hinrichs, Paul Kaufman, Brian Gardner, and Ron Hackney.  Defendants further admit that members of the Committee received no separate compensation for their service on the Committee.  Defendants deny the remaining allegations contained in Paragraph 16.

17.    **Defendant Patrick J. Moore ("Moore")** is the Chief Executive Officer ("CEO") of SSCC and Chairman of its Board of Directors. On information and belief, his responsibilities included appointing and monitoring senior management at SSCC and SSCE. Moreover, as a member of the Board of Directors, the Plans vested him with the responsibility to appoint and monitor the members of the Administrative Committee, including the individual defendants described below.

**ANSWER:**    Defendants admit that Patrick J. Moore is the Chief Executive Officer of SSCC and Chairman of its Board of Directors.  Defendants further admit that under the Plans, the Board of Directors is responsible for appointing members of the Administrative Committee.  Defendants deny the remaining allegations contained in Paragraph 17.

18.    **Defendant Charles Hinrichs ("Hinrichs")** is the Senior Vice President and Chief Financial Officer ("CFO") of SSCC. Defendant Kaufman is also a member of the SSCC Committee.

**ANSWER:**   Defendants admit that Charles Hinrichs was the Senior Vice President and Chief Financial Officer of SSCC until May 18, 2009.  Defendants further admit that Defendant Hinrichs was a member of the SSCC Committee, and that Defendant Kaufman is a member of the SSCC Committee.  Defendants deny the remaining allegations contained in Paragraph 18.

19.   **Defendant Paul K. Kaufman ("Kaufman")** is the Senior Vice President and Corporate Controller of SSCC. Defendant Kaufman is also a member of the SSCC Committee.

**ANSWER:**   Defendants admit the allegations contained in Paragraph 19.

20.   **Defendant Ron Hackney ("Hackney")** is the Senior Vice President Human Resources of SSCC with duties including the oversight of all human resources, labor, benefits and compensation matters within the entire SSCC organization. Hackney is also a member of the SSCC Committee.

**ANSWER:**   Defendants admit that Ron Hackney is the Senior Vice President of Human Resources and is also a member of the SSCC Committee.  Defendants deny the remaining allegations contained in Paragraph 20.

21.   **Defendant Brian Gardner ("Gardner")** is the Director of Corporate Finance and Pension Investments of SSCC with duties including the monitoring of the Plans' investment managers. Gardner is also a member of the SSCC Committee.

**ANSWER:**   Defendants admit that during the Class Period, Brian Gardner was the Director of Corporate Finance and Pension Investments.  Beginning approximately September 1, 2009, Mr. Gardner's title changed to Assistant Treasurer.  During the Class Period and currently, he has been a member of the SSCC Committee.  Defendants deny the remaining allegations contained in Paragraph 21.

## CLASS ACTION ALLEGATIONS

22.   Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules 23(a), (b)(1) and/or (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure, if and to the extent a class is deemed necessary, on behalf of a class consisting of all current and former Participants in the Plans for whose individual accounts the Plans held shares of SSCC common

stock (directly and/or through shares in the Fund) from January 28, 2008 to the present (the "Class").

**ANSWER:**   Defendants admit that the Plaintiffs purport to bring this action as a class action on behalf of the described individuals.   Defendants otherwise deny the allegations contained in Paragraph 22.

23.   The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are, at minimum, thousands of members of the Class. SSCE's annual report on Form 10-K for the fiscal year ended December 31, 2007 states that there were 22,700 employees as of year end 2007.

**ANSWER:**   Defendants admit the contents of SSCE's annual report on Form 10-K for the fiscal year ended December 31, 2007.  The remaining allegations contained in Paragraph 23 are legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny the remaining allegations contained in Paragraph 23.

24.   Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

        (a)   Whether Defendants were fiduciaries;

        (b)   Whether Defendants breached their fiduciary duties;

        (c)   Whether the Plans and the Participants were injured by such breaches; and

        (d)   Whether the Class is entitled to damages and injunctive relief.

**ANSWER:**   The allegations contained in Paragraph 24 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 24.

25.   Plaintiffs' claims are typical of the claims of the other members of the Class, as Plaintiffs and all members of the Class sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

**ANSWER:**   The allegations contained in Paragraph 25 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 25.

26.   Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained able counsel with extensive experience in class action ERISA litigation. The interests of Plaintiffs are coincident with and not antagonistic to the interests of the other class members.

**ANSWER:**   The allegations contained in Paragraph 26 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 26.

27.   Prosecution of separate actions by members of the class would create a risk of inconsistent adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

**ANSWER:**   The allegations contained in Paragraph 27 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 27.

28.   Questions of law and questions of fact which are common to the members of the class will predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this Complaint, taking into account:

(a)   the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(b)   the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(c)   the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(d)   the difficulties likely to be encountered in the management of a class action.

**ANSWER:**   The allegations contained in Paragraph 28 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 28.

29.   Moreover, because the damages suffered by many of the Participants will be relatively small, the expense and burden of individually litigating their rights would make it impossible to redress the wrongs alleged herein individually.

**ANSWER:**   The allegations contained in Paragraph 29 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 29.

## DESCRIPTION OF THE PLANS

30.   At all times relevant to this Complaint, the Plans were Employee Benefit Plans within the meaning of ERISA § 3(3) and 3(2)(A), 29 U.S.C. § 1002(3) and 1002(2)(A), and "Employee Pension Benefit Plans" within the meaning of ERISA §3(2)(A), 29 U.S.C. § 1002(2)(A).

**ANSWER:**   Defendants admit that the Plans were Employee Benefit Plans and Employee Pension Benefit Plans within the meaning of ERISA. The remaining allegations contained in Paragraph 30 are legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny the remaining allegations contained in Paragraph 30.

31.   The purpose of the Plans was to assist SSCC employees in saving and providing for their retirement. Jefferson-Smurfit Plan Document, § 1.2; SSCC Savings Plan Document, § 1.2; SSCC Hourly Plan Document, p. 1; St. Laurent Plan Document, p. 1.

**ANSWER:**   Defendants admit the allegations contained in Paragraph 31.

32.   The Plans were "Eligible Individual Account Plans" within the meaning of ERISA §407(d)(3), 29 U.S.C. §1 107(d)(3), and "Qualified Cash or Deferred Arrangement Plans" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k).

**ANSWER:**    Defendants admit that the Plans were Eligible Individual Account Plans within the meaning of ERISA and Qualified Cash or Deferred Arrangement Plans within the meaning of IRC.  The remaining allegations contained in Paragraph 32 are legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny the remaining allegations contained in Paragraph 32.

33.    The Plans were "Defined Contribution" and "Individual Account" plans within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plans provided for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which could be allocated to such Participant's accounts.

**ANSWER:**    Defendants admit that the Plans were Defined Contribution and Individual Account plans with the meaning of ERISA.  The remaining allegations contained in Paragraph 33 are legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny the remaining allegations contained in Paragraph 33.

34.    The Plans were voluntary contribution Plans whereby Participants elected to contribute a portion of their compensation to the Plans ("Employee Contributions"). The Company also made contributions to the Plans on behalf of its employee Participants. ("Matching Contributions").

**ANSWER:**    Defendants admit the allegations contained in Paragraph 34.

35.    The Plans provided a number of different options for investment of the Plans' assets, including the Fund. Participants selected the investment options in which the assets in their Plan accounts would be invested. The Administrative Committee had discretion to offer, modify or eliminate any investment option – including the Fund – as follows:

> SSCC Stock –The common stock of Smurfit-Stone Container Corporation and securities of any other class into which said shares may hereafter have been changed or which they may become, that (a) no amount shall be invested in SSCC Stock unless the SSCC Stock to be acquired with such amount is covered by an effective registration statement on Form S-8 under the Securities Act of 1933, and (b) **the Administrative Committee may impose limits on the amounts that may be used to acquire SSCC Stock.**

SSCC Hourly Plan Document, § 1.27; SSCC Savings Plan Document, § 2.31; Jefferson-Smurfit Plan Document, § 2.30; St. Laurent Plan Document, § 1.36 (emphasis added).

**The Administrative Committee may establish** such different investment Options as it from time to time determines to be necessary or advisable for the investment of Participating Accounts, including Investment Options pursuant to which Participating Accounts can be invested in "qualifying employer securities" as defined in Part 4 of Title I of ERISA. Any Investment Option may, on an interim basis, be invested, in whole or in part, in cash equivalents. Investment Options **may be added, suspended or terminated from time to time at the option of the Administrative Committee.**

SSCC Savings Plan Document, § 8.2(a); Jefferson-Smurfit Plan Document, § 8.2(a); St. Laurent Plan Document, § 9.2(a) (emphasis added).

Investment Options. From time to time **the Administrative Committee may cause** one or more investment funds to be established within the Trust Fund for the investment of Participants' accounts.

SSCC Hourly Plan Document, § 5.3 (emphasis added).

**ANSWER:**   Defendants admit the allegations contained in Paragraph 35 to the extent that they refer to accurately quoted Plan provisions, and incorporate by reference herein the full, complete and accurate Plan provisions cited in Paragraph 35.   Defendants deny the remaining allegations contained in Paragraph 35.

36.   The Plans' provisions regarding Employee and Company Matching Contributions are set forth below:

**ANSWER:**   Paragraph 36 does not contain any allegations directed at Defendants, and accordingly no response is required.

### Smurfit-Stone Container Corporation Savings Plan

37.   Under the Smurfit-Stone Container Corporation Savings Plan, participants were able to contribute on a pretax basis from 1% to 40% of eligible compensation as defined by the Plan. Participants could also contribute up to 20% on an after-tax basis with a combined limit up to 60%.

**ANSWER:**   Defendants admit that during the alleged class period, eligible participants were able to contribute on a pretax basis between 1% and 40% of their eligible compensation as defined by the Plan.   Defendants further admit that eligible participants could also contribute

between 1% and 20% of their eligible compensation on an after-tax basis.  Defendants deny the

remaining allegations contained in Paragraph 37.

38.     The Company made Matching Contributions up to the lesser of 70% of the first 6% of eligible compensation deferred by a participant or half of the elective contribution limit. Investment of the Company's Matching Contributions was participant-directed. All contributions were subject to applicable limitations.

**ANSWER:**     Defendants admit that the allegations contained in Paragraph 38 were

accurate through December 31, 2008.  Defendants deny the remaining allegations contained in

Paragraph 38.

39.     Effective May 1, 2007, an auto-enrollment feature was added to the Smurfit-Stone Container Corporation Savings Plan, providing for positive enrollment of new employees who did not opt out of this feature within their first 45 days of eligibility. The default contribution percentage was 3%, and the default investment fund was the T. Rowe Price Personal Strategy Balanced Fund.

**ANSWER:**     Defendants admit that effective May 1, 2007, an auto-enrollment feature

was added to the Smurfit-Stone Container Corporation Savings Plan.  Defendants further admit

the allegations contained in Paragraph 39 until on or about April 1, 2008.   Defendants deny the

remaining allegations contained in Paragraph 39.

40.     Participants were immediately vested in their contributions plus actual earnings thereon. However, vesting in the Company's matching contribution portion of accounts plus actual earnings thereon was based on years of continuous service. A participant was 100% vested in the matching contribution after five years of service, and vested in 20% of the employer match each year.

**ANSWER:**     Defendants admit the allegations contained in Paragraph 40.

**Jefferson Smurfit Corporation Hourly Savings Plan**

41.     Under the Jefferson Smurfit Corporation Hourly Savings Plan, participants were able to contribute from 1% to 20% of eligible compensation as defined by the Plan.

**ANSWER:**     Defendants admit the allegations contained in Paragraph 41.

42.     The Company and other affiliated participating employers within the controlled group made a Matching Contribution of 0% to 50% of eligible compensation that a participant contributed to the Plan subject to maximum dollar amounts as provided by the Plan or applicable collective bargaining agreements. Investment of the Company's matching contributions were participant-directed. All contributions were subject to applicable limitations.

**ANSWER:**     Defendants admit the allegations contained in Paragraph 42.

43.     Participants were immediately vested in their contributions plus actual earnings thereon. The Company's matching contributions plus actual earnings thereon were vested in 20% increments after one year of service with 100% vesting after five years of service.

**ANSWER:**     Defendants admit the allegations contained in Paragraph 43.

**Smurfit-Stone Container Corporation Hourly Savings Plan**

44.     Under the Smurfit-Stone Container Corporation Hourly Savings Plan, participants were able to contribute on a pretax basis from 1% to 25% of eligible compensation up to the maximum amount permitted by the Internal Revenue Code and subject to the other limitations included in various supplements to the plan document.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 44.

45.     The Company made a Matching Contribution, on behalf of each participant who was eligible to share in employer contributions, equal to a percentage of each participant's deferred compensation, subject to various limitations outlined in supplements to the plan document. Investment of the Company's matching contributions was participant-directed.

**ANSWER:**     Defendants admit the allegations contained in Paragraph 45.

46.     Participants were immediately vested in their contributions plus actual earnings thereon. Vesting in the Company's Matching Contribution portion of accounts plus actual earnings thereon was based on the location where the participant was employed and the locally negotiated organized labor contract, generally either immediate vesting or vesting in 20% increments after each year of service with full vesting after five years of service.

**ANSWER:**     Defendants admit the allegations contained in Paragraph 46.

**St. Laurent Paperboard Hourly Savings Plan**

47.     Under the St. Laurent Paperboard Hourly Savings Plan, participants were able to contribute from 1% to 20% of eligible compensation, as defined by the Plan, depending on the amount permitted for the particular location.

**ANSWER:**    Defendants admit the allegations contained in Paragraph 47, and further state that the maximum contribution was 20% for all locations under the Plan.

48.    The Company made a Matching Contribution in varying amounts depending on the location where the participant is employed. The Company's Matching Contributions were invested according to participant direction. All contributions were subject to applicable limitations.

**ANSWER:**    Defendants admit the allegations contained in Paragraph 48.

49.    Participants were immediately vested in their contributions plus actual earnings thereon. Vesting in the Company's Matching Contribution portion of accounts plus actual earnings thereon was based on years of continuous service. A participant was 100% vested after five years of service, vesting in 20% of the employer match each year

**ANSWER:**    Defendants admit the allegations contained in Paragraph 49.

## DEFENDANTS WERE FIDUCIARIES

50.    At all times relevant to this Complaint, Defendants were fiduciaries of the Plans because:

    (a)    they were so named; and/or

    (b)    they exercised authority or control respecting management or disposition of the Plans' assets; and/or

    (c)    they exercised discretionary authority or discretionary control respecting management the Plans; and/or

    (d)    they had discretionary authority or discretionary responsibility in the administration of the Plans.

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

**ANSWER:**    The allegations contained in Paragraph 50 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 50.

51.    In that regard, a person is a fiduciary even if a plan does not name him as such or by its terms assign fiduciary duties to him where by his conduct he engages in fiduciary activities. The test for whether a person (or entity) is a fiduciary is functional and based on actual conduct. Those who have control over management of a plan or plan assets are fiduciaries

15

regardless of the labels or duties assigned to them by the language of a plan. Moreover, in order to fulfill the express remedial purpose of ERISA, the definition of "fiduciary" is to be construed broadly.

**ANSWER:**   The allegations contained in Paragraph 51 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 51.

52.   A fiduciary may not avoid his fiduciary responsibilities under ERISA by relying solely on the language of the plan documents. While the basic structure of a plan may be specified within limits by the plan sponsor, the fiduciary may not follow the plan document if to do so leads to an imprudent result under ERISA § 404(a)(1)(d), 29 U.S.C. § 1104(a)(1)(D).

**ANSWER:**   The allegations contained in Paragraph 52 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 52.

## Defendant SSCC Committee

53.   Pursuant to the Plan Documents, the SSCC Committee was the Plan Administrator and the Named Fiduciary of each of the Plans. The Committee had and exercised fiduciary authority or control over the management and disposition of the Plans' assets, including the Plans' investments in the Fund and the Fund's investment in SSCC stock. In particular the Committee had the duty and ability to select and monitor Plan investment options and the prudence thereof, and, *inter alia*, to remove, restrict or reconfigure any investment options that were not prudent, including the Fund. Jefferson-Smurfit Plan Document, §§ 8.2(a), 2.30; St. Laurent Plan Document §§ 1 36, 9.2(a); SSCC Hourly Plan Document §§ 1.27, 5.3; SSCC Savings Plan Document, §§ 2.31, 8.2. Additionally the SSCC Committee had the ability and fiduciary responsibility to prepare and disseminate written communications to Participants containing information to be used by Participants in managing their Plan investments, such as investing in the Fund, including, *inter alia*, those communications referenced below. See St. Laurent Plan Document, § 9.3(b)(ix), SSCC Savings Plan Document § 8.3(e)(ix), Jefferson-Smurfit Plan Document, § 8.3(b)(ix) ("with respect to Company stock, Participants shall be provided with all information generally required to be provided to shareholders of the Company.")

**ANSWER:**   The Plan documents speak for themselves.   Accordingly, Defendants further incorporate by reference herein the entirety of the Plan documents referenced in Paragraph 53.  Defendants deny the remaining allegations contained in Paragraph 53.

54.     Consequently, in light of the foregoing powers, duties, responsibilities, and actions, the SSCC Committee was, on information and belief, both a named fiduciary of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and a de facto fiduciary within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that it exercised discretionary authority or discretionary control with respect to management of the Plans, exercised authority or control with respect to management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

**ANSWER:**     The allegations contained in Paragraph 54 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 54.

### Defendants Hinrichs, Kaufman, Hackney and Gardner

55.     Defendants Hinrichs, Kaufman, Hackney and Gardner, as members of the SSCC Committee had all of the duties and responsibilities of the Committee. As Committee members, they exercised authority and control over the Plans' administration and the Plans' investments, including the Plans' investments in the Fund and the Funds' investment in SSCC stock.

**ANSWER:**     The allegations contained in Paragraph 55 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 55.

56.     Consequently, in light of the foregoing duties, responsibilities, and actions, Defendants Hinrichs, Kaufman, Hackney and Gardner were fiduciaries of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), because they exercised discretionary authority or discretionary control with respect to management of the Plans, exercised authority or control with respect to management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

**ANSWER:**     The allegations contained in Paragraph 56 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 56.

### Defendant Moore

57.     Defendant Moore was a fiduciary of the Plans because, as a member (Chair) of the SSCC Board of Directors, he had the fiduciary duty to appoint and monitor the SSCC Committee and its members. SSCC Plan Document § 10,1; Jefferson-Smurfit Plan Document § 9,1; St. Laurent Plan Document § 8.1.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 57.

58.    Moreover, on information and belief, Defendant Moore exercised additional authority and control over the Plan and the Plans' investments, including the Plans' investments in the Fund, by exercising control over the SSCC Committee and its members as employees of SSCC, they acted at his direction as the Company's CEO.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 58.

59.    On information and belief, Moore also exercised discretionary authority with respect to the Plans by: (a) determining or participating in decisions about the substantive content of SSCC's SEC filings, which, on information and belief, were incorporated by reference into the SPDs, Prospectus and Form S-8 registration statements, and (b) upon information and belief, participating in SSCC's decision to incorporate these communications into disclosures to Plan participants. Such filings were intended to communicate to participants information necessary for participants to manage their retirement benefits under the Plans.

**ANSWER:**    Defendants admit that Defendant Moore participated in decisions and determinations regarding the substantive content of the referenced SSCC's SEC filings and disclosures.  Defendants deny the remaining allegations contained in Paragraph 59.

60.    Consequently, in light of the foregoing duties, responsibilities, and actions, Moore, as the Company's CEO, was a fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that he exercised discretionary authority or discretionary control with respect to management of the Plans, exercised authority or control with respect to management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 60.

**FIDUCIARY DUTIES UNDER ERISA**

61.    **The Statutory Requirements.** ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly

prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

**ANSWER:**   The allegations contained in Paragraph 61 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 61.

62.   **The Duty of Loyalty.** ERISA imposes on a plan fiduciary the duty of loyalty-- that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ."

**ANSWER:**   The allegations contained in Paragraph 62 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 62.

63.   The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

**ANSWER:**   The allegations contained in Paragraph 63 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 63.

64.   **The Duty of Prudence.** Section 404(a)(1)(B) also imposes on a plan fiduciary the duty of prudence--that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."

**ANSWER:**   The allegations contained in Paragraph 64 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 64.

65.     **The Duty to Inform.** The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: 1) a negative duty not to misinform; 2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and 3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries. These duties to disclose and inform recognize the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the Participants, on the other.

> **ANSWER:**     The allegations contained in Paragraph 65 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 65.

66.     Pursuant to the duty to inform, fiduciaries of the Plans were required under ERISA to furnish certain information to Participants. Defendants were required to furnish the Summary Plan Description ("SPD") and a Prospectus to Participants. The SPD, the Prospectus and all information contained or incorporated therein constitutes a representation in a fiduciary capacity upon which Participants were entitled to rely in determining the identity and responsibilities of fiduciaries under the Plans and in making decisions concerning their benefits and investment and management of assets allocated to their accounts:

> The format of the summary plan description must not have the effect of misleading, misinforming or failing to inform participants and beneficiaries. Any description of exceptions, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations. The description or summary of restrictive plan provisions need not be disclosed in the summary plan description in close conjunction with the description or summary of benefits, provided that adjacent to the benefit description the page on which the restrictions are described is noted.

29 C.F.R. § 2520.102-2(b). Here, upon information and belief, Defendants purported to make that required disclosure concerning the Fund by incorporating by reference into the Plans' Prospectus and/or SPD, all of SSCC's filings under Sections 13(a) and (c), 14 and/or 15 of the Securities Exchange Act.

> **ANSWER:**     The allegations contained in Paragraph 66 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants admit that SSCC

made its required disclosures concerning the Fund to Plan participants, and deny the remaining

allegations contained in Paragraph 66.

67.     **The Duty to Investigate and Monitor Investment Alternatives.** With respect to a pension plan such as the Plans, the duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of the investment alternatives in the Plans including employer securities, to ensure that each investment is a suitable option for the Plans.

**<u>ANSWER:</u>**     The allegations contained in Paragraph 67 are legal conclusions to which

no response is required.   To the extent that a response is required, Defendants deny the

allegations contained in Paragraph 67.

68.     **The Duty to Monitor Appointed Fiduciaries.** Fiduciaries who have the responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries thus appointed. The duty to monitor entails both giving information to and reviewing the actions of the appointed fiduciaries. In a 401(k) plan such as the Plans the [sic] monitoring fiduciaries must therefore ensure that the appointed fiduciaries:

(a)     possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties;

(b)     are knowledgeable about the operations of the Plans the goals of the Plans and the behavior of Plans' participants;

(c)     are provided with adequate financial resources to do their jobs;

(d)     have adequate information to do their jobs of overseeing the Plans' investments with respect to company stock;

(e)     have access to outside, impartial advisors when needed;

(f)     maintain adequate records of the information on which they base their decisions and analysis with respect to Plans' investment options; and

(g)     report regularly to the monitoring fiduciaries.

The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

**ANSWER:**   The allegations contained in Paragraph 68 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 68.

69.   **The Duty Sometimes to Disregard Plan Documents.** A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents. While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary may not blindly follow the plan document if to do so leads to an imprudent result or if such is the result of a lack of loyalty. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

**ANSWER:**   The allegations contained in Paragraph 69 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 69.

70.   **Co-Fiduciary Liability.** A fiduciary is liable not only for fiduciary breaches within the sphere of his own responsibility, but also as a co-fiduciary in certain circumstances. ERISA § 405(a), 29 USC § 1105(a), states, in relevant part, that:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

**ANSWER:**   The allegations contained in Paragraph 70 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 70.

71.   **Non-Fiduciary Liability**. Under ERISA non-fiduciaries who knowingly participate in a fiduciary breach may themselves be liable for certain relief under ERISA § 502(a)(3), 29 USC § 1132(a)(3).

**ANSWER:**    The allegations contained in Paragraph 71 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 71.

## BACKGROUND

72.    Throughout the Class Period, Defendants either knew or should have known that the Fund was an imprudent investment because (i) it was an excessively risky investment for retirement assets in light of the Company's increasing financial problems; and (ii) the price of SSCC stock and Fund shares was artificially inflated as a result of the Company's failure to disclose the extent of its credit problems and other material adverse facts concerning the business conditions at SSCC and the viability of the Company.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 72.

## SUBSTANTIVE ALLEGATIONS

73.    SSCC is a leading manufacturer of paperboard and paper-based packaging. The company's major products include containerboard and corrugated containers. Its share of the North American market approximates 18 percent for both of these products. Smurfit-Stone also produces kraft paper, bleached paperboard and market pulp, and is a global leader in the collection of recycled paper, a key raw material for its products.

**ANSWER:**    Defendants admit the allegations contained in Paragraph 73.

74.    SSCC was formed in November 1998 out of the merger of Jefferson Smurfit Corporation and Stone Container Corporation, two paper-based packaging companies.

**ANSWER:**    Defendants admit the allegations contained in Paragraph 74.

75.    Since its formation, SSCC was a highly-leveraged company that maintained a significant debt level well above other competitor companies. In order to simplify and consolidate the Company's debt financing activities, in November 2004, SSCC's two primary operating companies were merged into a single company, SSCE, a wholly owned subsidiary of SSCC that operated 14 mills, 121 corrugated converting operations, and 27 recycling plants.

**ANSWER:**     Defendants admit that since its formation, SSCC was a leveraged company with a large debt level and has disclosed in its 10-K filings that it was more highly leveraged than some of its competitors.   Defendants further admit that, in part, in order to simplify and consolidate its debt financing activities, in November 2004, SSCC's two primary

operating companies were merged into a single company, SSCE.  Defendants deny the remaining

allegations contained in Paragraph 75.

76.    SSCC had long recognized that its highly leveraged capital structure put the company at significant risk. In its Form 10-K for the fiscal year ended December 31, 2005, filed on March 6, 2006, the Company disclosed:

**We have a highly leveraged capital structure.**

Our high leverage could have significant consequences for us, including the following:

- we may be required to seek additional sources of capital, including additional borrowings under our existing credit facilities, other private or public debt or equity financings to service or refinance our indebtedness, which borrowings may not be available on favorable terms, particularly in the event that our credit ratings are downgraded by rating agencies;

- a substantial portion of our cash flow from operations will be needed to meet the payment of principal and interest on our indebtedness and other obligations and will not be available for our working capital, capital expenditures and other general corporate purposes; and

- our level of debt makes us more vulnerable to economic downturns and reduces our operational and business flexibility in responding to changing business and economic conditions and opportunities.

In addition, we are more highly leveraged than some of our competitors, which may place us at a competitive disadvantage.

**ANSWER:**    Defendants admit the allegations contained in Paragraph 76 with respect to

SSCC's Form 10-K disclosure for the fiscal year ended December 31, 2005, filed on March 6,

2006.  Defendants deny the remaining allegations contained in Paragraph 76.

77.    In or about 2005, SSCC implemented a transformation program which was aimed reducing [sic] its debt and improving its performance. Over the next three years, in connection with this program, SSCC closed numerous mills and other manufacturing facilities in an effort to pay down its debt obligations and finance some capital expenses.

**ANSWER:**    Defendants admit that on or about 2005, SSCC implemented a three-year

transformation program which was aimed at improving its performance and included the closure

of manufacturing facilities.  Defendants deny the remaining allegations contained in Paragraph

77.

78.    On January 28, 2008, following years of implementation, SSCC announced that it was effectively executing its transformation program. In particular, Defendant Moore indicated that the transformation program was moving along according to plan. The press release attached to the Company's Form 8-K read:

### Executing Smurfit-Stone's Transformation Strategy

Commenting on the company's results, Patrick J. Moore, chairman and CEO, said, "I am pleased to report Smurfit-Stone's year-over-year adjusted earnings improved both in the fourth quarter and full year 2007. The successful implementation of our recent price increases, improving business mix, and savings from operational improvements drove higher profits, despite continued inflationary cost pressures. We reduced debt significantly during the year, strengthening our balance sheet and enhancing our financial flexibility. At the same time, we invested capital to establish one of the most modern converting operations in North America. As we continue to execute our strategy, I am confident our efforts will drive improved financial performance in the future."

Upon the announcement of fourth quarter of 2007 results, SSCC's stock closed at $8.36.

**ANSWER:**    Defendants admit the allegations contained in Paragraph 78, except to the

extent that SSCC stock closed at $8.49 on January 28, 2008.

79.    However, on information and belief, Defendants knew or should have known that the Company's highly-leveraged capital structure had placed it in jeopardy of bankruptcy and there was little likelihood that SSCC's transformation program would save the company from collapse.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 79.

80.    While senior management touted the firm's "financial flexibility" and "progress" in the January 28 release, SSCC's total liabilities were $3.359 billion, and the company maintained a debt to equity ratio of 1.55 – over one and a half times its market value.

**ANSWER:**    Defendants admit that SSCC's total debt was $3.359 billion on or around

January 28, 2008.  Defendants deny the remaining allegations contained in Paragraph 80.

81.    These high debt levels created a high risk of bankruptcy. The probability of a company entering bankruptcy can be calculated using a financial analytical tool called a Z-score.

The Z-score formula for predicting bankruptcy is a multivariate formula that measures the financial health of a company and predicts the probability of bankruptcy within two years. Studies measuring the effectiveness of the Z-score have shown the model to be accurate in greater than 70% of its applications.

**ANSWER:**   Defendants deny the allegations contained in the first sentence of Paragraph 81.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 81.

82.   The Z-score combines four or five common business ratios using a weighting system calculated to determine the likelihood of bankruptcy. If the Z-score is 3.0 or above, bankruptcy is not likely. If the Z-score is 1.8 or less, bankruptcy is likely.

**ANSWER:**   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 82.

83.   As of December 31, 2007, SSCC's Z-score was 1.4754, which indicated a high risk that the Company would soon enter bankruptcy.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 83.

84.   The bankruptcy risk at SSCC was particularly increased by an on-going sub-prime credit crisis which was having a wide ranging effect on finance and credit markets throughout the country in 2007 and early 2008. Indeed, throughout January 2008, the US equity and credit markets took a significant downturn in the initial wake of this crisis.

**ANSWER:**   Defendants deny the allegations contained in the first sentence of Paragraph 84.  Defendants admit the allegations contained in the second sentence of Paragraph 84.

85.   By January 28, 2008, numerous factors -- viewed in totality -- indicated that investment in SSCC was imprudent, particularly for retirement assets. These factors included (a) the Company's highly-leveraged capital structure, (b) its excessive debt to equity ratio, (c) a Z-score which predicted that bankruptcy was likely and (d) the impact of the shrinking economy and credit markets. The combination of these factors, among other things, demonstrated that the Plans' investment in the Fund and the Fund's investment in SSCC stock was excessively risky for retirement assets.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 85.

86.    While SSCC pursued the final stages of its transformation program, the U.S. credit markets began to unravel swiftly and sharply. The collapse of the subprime mortgage industry occurring throughout 2007 had escalated into a crisis for major lenders and investment banks. Numerous banks, including Citigroup, UBS, Deutsche Bank, Merrill Lynch, and Morgan Stanley, reported staggering losses and writes offs. On March 16, 2008, Bear Stearns was acquired by JPMorgan Chase in a fire sale to avoid bankruptcy. The deal was backed by the Federal Reserve, providing up to $30 billion to cover possible Bear Stearns losses. These circumstances resulted in a tightening of the credit markets on which SSCC relied for continued financing and an overall slowing of the economy and the demand for SSCC products.

**ANSWER:**    Defendants admit the allegation contained in the last sentence of

Paragraph 86.  Defendants lack knowledge or information sufficient to form a belief as to the

truth of the remaining allegations contained in Paragraph 86, and therefore deny the remaining

allegations contained in Paragraph 86.

87.    On April 22, 2008, SSCC filed a Form 8-K announcing its first quarter earnings and an increase in SSCC's overall debt:

> Commenting on the company's first quarter, Moore said, "First quarter results were disappointing as we faced a challenging US business climate. We remain focused on transforming our operations and I expect continued savings from our strategic initiatives program will benefit future earnings. Selling prices improved for the fifth consecutive quarter as we completed our box price initiative from last fall. Despite this, earnings declined sequentially due to a charge related to Calpine Corrugated, seasonal factors, and significantly higher than expected cost inflation. The slower US economy also negatively impacted packaging demand." As previously announced, Smurfit-Stone expects to acquire a controlling interest in Calpine Corrugated LLC in the second quarter 2008. The first quarter results include a $0.05 per share charge related to Calpine.

> * * * *

> Commenting on the company's financial position, [Defendant] Charles A. Hinrichs, senior vice president and CFO, said, **"Our debt increased in the first quarter due to the seasonal increase in working capital and capital spending in our converting operations. Over the past two years, Smurfit-Stone has significantly improved its financial flexibility by reducing debt more than $1 billion, lowering interest expense, and extending debt maturities."**

**ANSWER:**    Defendants admit the allegations contained in Paragraph 87.

88.     Upon the announcement of first quarter of 2008 results, SSCC's stock closed at $6.82 and its debt to equity ratio was 1.99, nearly two times its market value. Nonetheless, SSCC continued to proclaim that its transformation program was moving along according to plan. The Company stated:

> ### Smurfit-Stone remains focused on transformation program
>
> Smurfit-Stone expects sequential earnings improvement in the second quarter. Results should benefit from seasonally stronger packaging demand, less energy usage, and lower employee benefit costs despite continued significant cost inflation. Commenting on Smurfit-Stone's long term outlook, [Defendant] Moore said, **"As a result of our transformation program, our operations are more cost effective, our mills are more productive, and we are building one of the most modern converting operations in North America. We are confident that by staying the course and executing our plan, we will deliver long-term value for our shareholders, customers, and employees."**

SSCC Form 8-K, dated April 22, 2008 (emphasis added).

**ANSWER:**    Defendants admit that upon the announcement of first quarter of 2008 results, SSCC's stock closed at $6.82.  Defendants further admit SSCC filed a Form 8-K dated April 22, 2008, which included the quoted passage in Paragraph 88.  Defendants deny the remaining allegations contained in Paragraph 88.

89.     On May 19, 2008, Moody's Investors Service ("Moody's) downgraded SSCE's rating on speculative grade liquidity ("SGL") from SGL-2 (good) to SGL-3 (adequate). A company's speculative grade liquidity rating is an assessment of its ability to meet obligations coming due during the next twelve months. The SGL rating system was developed by Moody's to provide guidance regarding a company's liquidity risk and the possibility of default. Moody's explained the downgrade as follows:

> Moody's believes the company's operating performance will continue to be challenged by a slower US economy and high energy, freight, fiber and chemical costs. As a result covenant compliance is also expected to be tighter over the next four quarters. As of March 31, 2008, the actual consolidated senior secured leverage ration was 1.96x versus a required ration of 3.0x. Moody's expects the company to manage a modest cushion under its covenant compliance with a potential need to renegotiate covenant levels over the near term.
>
> Over the recent past, SSCE has been unable to reduce its debt load from internally generated free cash flow. The company's debt reduction has been made primarily through asset sales proceeds and business

divestitures. **Even at current containerboard pricing levels, which Moody's views as being reasonably healthy, SSCE is unlikely to repay significant amounts of debt. If prices fall as demand slackens or inflationary cost pressures are greater than expected, or the US economy further slows, the outlook may be revised to negative.**

In addition, Stock Diagnostics downgraded SSCC's Operational Cash Flow Per Share ("OPS") from 1 to 2. SSCC stock closed at $6.12.

**ANSWER:**   Defendants state that the Moody's Report of May 19, 2008 referred to in

Paragraph 89 speaks for itself.  Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 89 regarding the Stock Diagnostics report.

Defendants deny the remaining allegations contained in Paragraph 89.

90.    Throughout May through July, the credit crisis continued as Standard & Poor's cut credit ratings at Morgan Stanley, Merrill Lynch, and Lehman Brothers and Lehman Brothers posted a $3 billion loss.

**ANSWER:**   Defendants lack knowledge or information sufficient to form a belief as to

the truth of the allegations contained in Paragraph 90.

91.    On July 28, 2008, SSCC filed a Form 8-K announcing its second quarter earnings for 2008:

> Smurfit-Stone Container Corporation (NASDAQ: SSCC) today reported a second quarter 2008 adjusted net loss of $31 million, or $0.12 per diluted share. Results compare to adjusted net income of $15 million, or $0.06 per share, in the second quarter 2007 and an adjusted net loss of $24 million, or $0.09 per share, in the first quarter 2008. Adjusted net income (loss) reflects adjustments to net income (loss) available to common stockholders per diluted share, as detailed in the chart above.

> Sales of $1.8 billion for the second quarter 2008 were comparable to both the prior year quarter and first quarter 2008.

> Commenting on the company's second quarter performance, [Defendant] Patrick J. Moore, chairman and CEO, said, "We are seeing unprecedented cost inflation. As a result, our second quarter earnings were negatively impacted by higher-than-expected commodity costs including energy, freight and chemicals. **We are raising our selling prices to offset this higher cost inflation, restore profit margins, and improve cash flow in the second half of 2008. In addition, I am pleased with the excellent**

29

> **progress we are making on our transformation plan. We remain on track to complete this program and realize $525 million in cumulative savings this year.**"

(emphasis added). SSCC stock closed at $5.13.

    **ANSWER:**    Defendants admit the allegations contained in Paragraph 91.

**SSCC's Financial Condition Reaches Dire Levels**

    92.    By July 28, 2008, the risks at the Company had reached dire levels. Numerous external and internal factors indicated that the Company was excessively vulnerable to collapse: (a) the Company's debt to equity ratio nearly doubled to 2.72, almost three times its market value; (b) the Company's Z-score decreased to 1.1765, well below the 1.8 threshold indicating that bankruptcy was likely; (c) Moody's downgraded the Company's liquidity rating from SGL-2 to SGL-3 and (d) the Company's burdensome debt levels left it nearly defenseless in the face of shrinking a credit market.

    **ANSWER:**    Defendants deny the allegations contained in Paragraph 92.

    93.    Nonetheless, in the face of these excessive risks, Defendants continued to permit the Plans to offer the Fund and invest Plan assets in the Fund in violation of their fiduciary duties. Moreover, Defendants continued to tout the Company's transformation. Rather than protecting the Plans and Plan participants from further losses, Defendants turned a blind eye to these excessive risks and improperly offered and invested in the Fund while misrepresenting that the Company and its transformation plan was "on track."

    **ANSWER:**    Defendants deny the allegations contained in Paragraph 93.

    94.    By September, the global credit markets had spun into an unprecedented crisis as (a) the Federal government effectively took over of Fannie Mae and Freddie Mac, (b) Merrill Lynch was sold to Bank of America, (c) Lehman Brothers filed for bankruptcy, (d) Moody's and Standard and Poor's downgraded credit ratings on American International Group ("AIG"), (e) the United States Federal Reserve lent $85 billion to AIG to avoid bankruptcy, and (f) Washington Mutual was seized by the Federal Deposition Insurance Corporation, and its banking assets were sold to JP Morgan Chase.

    **ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 94.

    95.    As of September 30, 2008, SSCC's Z-score decreased to 1.0977 indicating an even higher probability that the Company would enter bankruptcy.

**ANSWER:**   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 95 regarding the calculation of "Z-scores." Defendants deny the remaining allegations contained in Paragraph 95.

96.   On October, 8, 2008, Bloomberg reported that SSCC's stock price dropped dramatically because of concerns that SSCC was having trouble renewing a credit facility that it relied upon for day-to-day operations.

**ANSWER:**   Defendants state that the October 8, 2008 Bloomberg report referred to in Paragraph 96 speaks for itself.

97.   In an effort to placate investor concern, Defendants issued a press release on October 8, 2008 that continued to tout SSCC's "financial flexibility." On October 9, 2008, SSCC's filed a Form 8-K which included the press release entitled "*Smurfit-Stone Reaffirms Its Financial Flexibility Amid Uncertain Economic Conditions; Announces Favorable Resolution of Tax Matters*"

> Smurfit-Stone Container Corporation (NASDAQ: SSCC) today reaffirmed its financial flexibility amid uncertain economic conditions and announced the favorable resolution of certain Canadian income tax matters.
>
> **Smurfit-Stone Reaffirms its Financial Flexibility**
>
> Commenting on the company's financial position, [Defendant] Patrick J. Moore, chairman and CEO, said: "**Maintaining financial flexibility is a top priority at Smurfit-Stone. Following unprecedented cost inflation earlier this year, we successfully raised our selling prices in the third quarter. Furthermore, mill production, box shipments and liquidity improved from the second quarter. We are in compliance with all financial covenants in our credit facilities and presently expect to remain in compliance into the fourth quarter of 2009.**"
>
> Regarding the company's business outlook, Moore said: "**We expect higher average selling prices and lower costs will drive sequentially improved financial performance in the fourth quarter. Smurfit-Stone remains focused on all necessary actions to ensure sufficient financial flexibility during these challenging economic conditions.**"

(emphasis added). On October 8, 2008, SSCC stock price closed at $2.57. On information and belief, the Company was experiencing significant difficulties securing debt financing. Moreover,

on information and belief, as of October 8, 2008, the Company's debt levels remained at or about $3.5 billion; consequentially, its debt to equity ratio soared to 5.43 or nearly five and half times its market value.

**ANSWER:**   Defendants admit SSCC filed a Form 8-K on October 9, 2008, which

included the press released quoted in Paragraph 97.  Defendants deny the remaining allegations

contained in Paragraph 97.

98.    On October 17, 2008, SSCC announced the permanent closure of its Pulp Mill in Pontiac, Quebec, Canada.

**ANSWER:**   Defendants admit the allegations contained in Paragraph 98, but clarify

that the Pontiac Pulp Mill is located in Portage-du-Fort, Quebec.

99.    On October 22, 2008, SSCC filed a Form 8-K with the SEC which announced its financial results for the third quarter ended September 23, 2008. According to the release, SSCC reported an adjusted net loss of $0.08 per share:

> Smurfit-Stone Container Corporation (NASDAQ: SSCC) today reported third quarter 2008 net income available to common stockholders of $62 million, or $0.24 per share. As previously reported, earnings benefited $84 million, or $0.33 per share, from the favorable resolution of Canadian income tax matters.
>
> **Adjusting for the items detailed in the chart above, Smurfit-Stone reported a third quarter 2008 adjusted net loss of $21 million, or $0.08 per diluted share.** Results compare to adjusted net income of $28 million, or $0.11 per share, in the third quarter 2007 and an adjusted net loss of $31 million, or $0.12 per share, in the second quarter 2008.
>
> Sales of $1.9 billion for the third quarter 2008 were up 2.3 percent on a sequential basis and were comparable to the third quarter 2007.
>
> Commenting on the company's third quarter performance, [Defendant] Patrick J. Moore, chairman and CEO, said, "As expected, our adjusted earnings improved from the second quarter. We raised our containerboard and box prices and both mill production and box shipments improved. Higher selling prices and greater volume more than offset incremental cost inflation. To guard against rapidly increasing commodity inflation, we expanded our hedging program earlier this year. However, as energy prices declined sharply later in the third quarter, we incurred a $0.04 per share loss related to our hedge position. **We continued to make progress implementing our transformation plan and we remain on-**

> **track to realize $525 million in cumulative savings this year. Our liquidity improved in the third quarter and we remain in compliance with all financial covenants."**

(emphasis added).

> **ANSWER:**   Defendants admit the allegations contained in Paragraph 99.

100.   On October 22, 2008, upon the announcement of 2008 Third Quarter results, SSCC's stock closed at $0.87 and its debt to equity ratio was 16.02 -- *over sixteen times its market value*.

> **ANSWER:**   Defendants admit that on October 22, 2008, upon the announcement of 2008 Third Quarter results, SSCC's stock closed at $0.87.   Defendants deny the remaining allegations contained in Paragraph 100.

101.   In or about this time, SSCC's debt/default risk – the risk that the company would be unable to pay its contractual interest or principal on its debt obligations – soared, reaching levels which significantly departed from SSCC's competitors.

> **ANSWER:**   Defendants deny the allegations contained in Paragraph 101.

102.   On December 18, 2008, SSCC filed a Form 8-K with the SEC which reported that the Company was revising its earnings guidance for the fourth quarter of fiscal 2008. The Company's press release stated:

> SMURFIT-STONE EXPECTS LOWER FOURTH QUARTER EARNINGS DUE TO WEAKENING MARKET CONDITIONS AND PRODUCTION DOWNTIME
>
> CREVE COEUR, MO., and CHICAGO, December 18, 2008 — Smurfit-Stone Container Corporation (NASDAQ: SSCC) announced today that it expects its fourth quarter earnings excluding unusual items will be significantly lower compared to third quarter 2008 results. North American packaging demand has deteriorated rapidly in the past several weeks and containerboard and pulp export markets have weakened even more dramatically. The company has been required to take significant market-related mill downtime to balance its supply with available demand. Smurfit-Stone presently expects to reduce containerboard and kraft paper production by up to 255,000 tons and softwood pulp production by up to 35,000 tons in the fourth quarter. These reductions are in addition to the previously announced permanent closures of the company's corrugated medium machine in Snowflake, Arizona and its hardwood pulp mill in Portage du Fort, Quebec in October.

SSCC's stock price closed at $0.31.

>    **ANSWER:**    Defendants admit the allegations contained in Paragraph 102.

103.    As of December 31, 2008, SSCC's Z-score decreased dramatically into negative numbers. The Z-score of -1.1114 revealed in stark terms that the company was virtually guaranteed to be bankrupt.

>    **ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 103 regarding the calculation of "Z-scores." Defendants deny the remaining allegations contained in Paragraph 103.

104.    On January 13, 2009 -- while the stock was trading at $0.35 per share -- SSCC provided its senior executives with over $1.4 million dollars in Management Incentive Plan ("MIP") bonuses. The bonuses were distributed in the following amounts:

| | | |
|---|---|---|
| Patrick J. Moore, Chairman and Chief Executive Officer | 100% | $553,500 (50% of salary) |
| Steven J. Klinger, President and Chief Operating Officer | 100% | $397,500 (50% of salary) |
| Charles A. Hinrichs, Senior Vice President and Chief Financial Officer | 60% | $130,000 (31.1% of salary) |
| Mack C. Jackson, Senior Vice President and General Manager – Containerboard Mill and Forest Resources Division | 60% | $131,000 (31.0% of salary) |
| Craig A. Hunt Senior Vice President, Secretary and General Counsel | 60% | $204,250 (50% of salary) |

>    **ANSWER:**    Defendants admit that on January 13, 2009, the SSCC stock was trading at $0.35 per share. Defendants further admit that on January 14, 2009, SSCC filed a Form 8-K reporting the bonus information contained in Paragraph 104. Defendants deny the remaining allegations contained in Paragraph 104.

105.    According to the Company's press release:

The MIP performance objectives for fiscal 2008 were based on a number of responsibility-specific business area goals for each named executive officer. Goals for Messrs. Moore, Klinger and Hinrichs were based on meeting or exceeding the 2008 budgeted earnings before interest, taxes, depreciation and amortization ("EBITDA") and the accomplishment of specific strategic cost reduction and profit initiatives (65%). The remaining thirty-five percent (35%) of the target for Messrs. Moore, Klinger and Hinrichs was based on the discretion of the Committee and was dependent on overall Company performance, not tied to specific criteria. MIP goals for 2008 for Mr. Jackson were based on meeting or exceeding the 2008 budgeted EBITDA (30%), accomplishment of specific corporate (30%) and division (30%) strategic cost reduction and profit initiatives, and achievement of division safety goals (10%). MIP goals for 2008 for Mr. Hunt were based on meeting or exceeding the 2008 budgeted EBITDA (50%) and the accomplishment of specific corporate strategic cost reduction and profit initiatives (50%).

The performance threshold of $767 Million for payment of the portion of awards based on meeting or exceeding the 2008 budgeted corporate EBITDA operating results was not achieved in fiscal 2008 and no MIP awards were made to any of the executive officers with respect to this performance objective. With respect to the performance objective of achieving specific corporate (and division, in the case of Mr. Jackson) strategic cost reduction and profit initiatives, the Committee determined that the $87 Million target for fiscal 2008 would have been achieved but for the significant market-related mill downtime taken in the fourth quarter of fiscal 2008 in response to the extraordinary economic circumstances facing the Company and the U.S. economy generally, and exercised its discretion to adjust the amount of the MIP awards for executive officers accordingly to recognize the significant accomplishments of management in substantially completing the strategic initiative program.

Payment of the MIP awards for 2008 was made entirely in cash.

**ANSWER:**    Defendants admit the allegations contained in Paragraph 105.


106.    In a January 15, 2009 article entitled *Smurfit-Stone Debt Risk Soars*, *Bucking Peer Trend*, Bloomberg reported that the risk that Smurfit-Stone Container Corp. would fail to repay its bonds and loans surged to a record compared to other U.S. paper and packaging companies. Indeed, the article noted that SSCC's debt-default risk started to rise "in October after a stock downgrade by Goldman Sachs Group Inc., the closure of a Quebec paper mill and a third quarter earnings report."

**ANSWER:**    Defendants state that the January 15, 2009 Bloomberg article referred to in

Paragraph 106 speaks for itself.

107.    On the same day, the Wall Street Journal reported that SSCC had told lenders that it may file for bankruptcy amid weakening sales and a cash crunch. On January 15, 2009, SSCC stock closed at $0.05 per share.

**ANSWER:**    Defendants state that the January 15, 2009 Wall Street Journal article referred to in Paragraph 107 speaks for itself.   Defendants deny the remaining allegations contained in Paragraph 107.

108.    On January 26, 2009. SSCC filed a Form 8-K with the SEC announcing that it had filed for bankruptcy. The Company's release stated:

> Smurfit-Stone Container Corporation today announced that it and its U.S. and Canadian subsidiaries have filed voluntary petitions for reorganization under Chapter 11 in the U.S. Bankruptcy Court in Wilmington, Delaware. The Canadian subsidiaries will also file to reorganize under the Companies' Creditors Arrangement Act (CCAA) in the Ontario Superior Court of Justice in Canada.
>
> The Company plans to use this process to restructure its debt, resulting in a capital structure more suited to support its long-term growth and profitability. The Company's normal day-to-day operations will continue without interruption. Smurfit-Stone remains completely focused on serving its customers.
>
> [Defendant] Patrick J. Moore, chairman and CEO, said, "Over the past decade, we built one of North America's premier containerboard and packaging companies. But, our financial performance has not reflected the full potential of our earnings power due to higher cost operations and burdensome debt levels dating back to the original formation of the company. As a result of our three-year transformation program, we have been focused on improving our operating performance and our operations are now well invested and far more cost effective.
>
> "Yet, the acceleration of the unprecedented global economic recession has weakened demand for packaging, and the frozen credit markets have prevented an out-of-court refinancing of our capital structure. While this is not the outcome we anticipated, we are taking this action to become a more financially healthy company . . . .

**ANSWER:**    Defendants admit the allegations contained in Paragraph 108.

109.    On January 26, 2009, SSCC also received a letter from The Nasdaq Stock Market ("Nasdaq") which notified SSCC that, pursuant to Nasdaq's marketplace rules, SSCC's common stock would be delisted and that trading would be suspended. In SSCC's Form 8-K dated

January 26, 2009, the Company disclosed that it did not intend to take any action to appeal Nasdaq's decision.

> **ANSWER:**    Defendants admit the allegations contained in Paragraph 109.

110.    Effective as of the opening of business on February 4, 2009, SSCC common stock was delisted from Nasdaq and trading of common stock was suspended. Thereafter, the common stock was quoted on the Pink Sheets Electronic Quotation Service (the "Pink Sheets") under the ticker symbols SSCCQ.PK.

> **ANSWER:**    Defendants admit the allegations contained in Paragraph 110.

111.    SSCC is currently operating as a "debtor-in possession" under the jurisdiction of United States and Canadian Bankruptcy Courts.

> **ANSWER:**    Defendants admit the allegations contained in Paragraph 111.

112.    In SSCC's annual report on Form 10-K for the fiscal year ended December 31, 2008, the Company disclosed that the "Chapter 11 bankruptcy filings raise substantial doubt about [SSCC's] ability to continue as a going concern."

> **ANSWER:**    Defendants admit the allegations contained in Paragraph 112.

**SSCC's Statements Were Material False and Misleading**

113.    The statements set forth at Paragraphs 74 to 95 were materially false or misleading for at least the following reasons:

> (a)    the Company's transformation program was fundamentally flawed and incapable of achieving the turn-around which was touted by the SSCC;

> (b)    the Company significantly misrepresented and failed to disclose material adverse disclosures regarding it "financial flexibility" and its ability to secure necessary financing for its day-to-day operations;

> (c)    the Company failed to disclose material adverse information regarding the true nature of the company's debt management; and

> (d)    The Company lacked the required internal controls, and, as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated facts.

> **ANSWER:**    Defendants deny the allegations contained in Paragraph 113.

## CAUSES OF ACTION

**A.      Count I:  Failure to Prudently and Loyally Manage the Plans and Assets of the Plans**

114.    Plaintiffs incorporate by reference the paragraphs above.

**ANSWER:**    Defendants incorporate by reference their foregoing answers and responses to the paragraphs above.

115.    This Count alleges fiduciary breach against all Defendants (the "Prudence Defendants).

**ANSWER:**    The allegations contained in Paragraph 115 are legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny the allegations contained in Paragraph 115.

116.    As alleged above, during the Class Period, the Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

**ANSWER:**    The allegations contained in Paragraph 116 are legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny the allegations contained in Paragraph 116.

117.    As alleged above, the scope of the fiduciary duties and responsibilities of the Prudence Defendants included managing the assets of the Plans for the sole and exclusive benefit of the Plans' Participants and beneficiaries and with the care, skill, diligence, and prudence required by ERISA. The Prudence Defendants were directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options and directing the trustee regarding the same, evaluating the merits of the Plans' investments on an ongoing basis, and taking all necessary steps to ensure that the Plans' assets were at all times invested prudently.

**ANSWER:**    The allegations contained in Paragraph 117 are legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny the allegations contained in Paragraph 117.

118.    Yet, contrary to their duties and obligations under the Plans' documents and ERISA, the Prudence Defendants failed to loyally and prudently manage the assets of the Plans. Specifically, during the Class Period, these Defendants knew or should have known that the Fund was no longer a suitable and appropriate investment for the Plans, but was, instead, an imprudent investment in light of the Company's material undisclosed fundamental weaknesses and the excessive risk associated with an investment in SSCC stock.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 118.

119.    Nonetheless, during the Class Period, these Defendants failed to act to protect the Plans and their participants and *inter alia* continued to permit the Plans to offer the Fund as an investment option for Employee and Matching Contributions and continued to permit the Plans to invest those contributions in the Fund and permit the Fund to invest in Company stock. They did so despite the fact that they knew or should have known that the prices of Fund and Company stock shares were artificially inflated and excessively risky.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 119.

120.    The Prudence Defendants were obliged to prudently and loyally manage all of the Plans' assets. However, their duties of prudence and loyalty were especially significant with respect to Company stock because: (a) company stock is a particularly risky and volatile investment, even in the absence of company misconduct; and (b) Participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 120.

121.    The Prudence Defendants had a duty to follow a regular, appropriate systematic procedure to evaluate the prudence of investing in the Fund, but either had no such procedure or failed to follow it. Moreover, they failed to conduct and act on the results of an appropriate investigation of the merits of continued investment in the Fund. Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to make and maintain investment in the Fund under these circumstances.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 121.

122.    The Prudence Defendants breached their fiduciary duty respecting the Plans' investment in Company stock described above, under the circumstances alleged herein, in that a prudent fiduciary acting under similar circumstances would have made different investment decisions.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 122.

123.    The Prudence Defendants were obligated to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the

conduct of an enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

**ANSWER:**   The allegations contained in Paragraph 123 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 123.

124.   According to United States Department of Labor ("DOL") regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

**ANSWER:**   The allegations contained in Paragraph 124 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 124.

125.   According to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

(a)   A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

(b)   Consideration of the following factors as they relate to such portion of the portfolio:

(i)   The composition of the portfolio with regard to diversification;

(ii)   The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

(iii)   The projected return of the portfolio relative to the funding objectives of the plan.

**ANSWER:**   The allegations contained in Paragraph 125 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 125.

126.   Given the conduct of the Company as described above, the Prudence Defendants could not possibly have acted prudently when they continued to invest the Plans' assets in Company stock because, among other reasons:

      (a)   The Prudence Defendants knew of and/or failed to investigate the failures of and dangers to the Company as alleged above; and

      (b)   The risk and volatility associated with the investment in Company stock during the Class Period was by far above and beyond the normal, acceptable risk associated with investment in company stock.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 126.

127.   This abnormal investment risk could not have been known by the Plans' Participants, and the Prudence Defendants knew that it was unknown to them, as it was to the market generally, because the fiduciaries never disclosed it.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 127.

128.   Knowing of this extraordinary risk, and knowing the Participants did not know it, and given the volatility in the Company's stock the Prudence Defendants had a duty to avoid permitting the Plans or any Participant from investing the Plans' assets in the Fund or Company stock.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 128.

129.   Further, knowing that the Plans were not adequately diversified, but were heavily invested in Company stock, the Prudence Defendants had a heightened responsibility to divest the Plans of Company stock if it became or remained imprudent.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 129.

130.   The Prudence Defendants breached their fiduciary duties by, *inter alia*, failing to engage appropriate independent advisors who could make independent judgments concerning the Plans' investment in the Company; failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made Company stock an unsuitable investment for the Plans; failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to avoid adversely impacting their own compensation or drawing attention to the Company's

condition and inappropriate practices; and by otherwise placing their own and the Company's interests above the interests of the Participants with respect to the Plans' investment in Company stock.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 130.

131.     As a consequence of the Prudence Defendants' breaches of fiduciary duty alleged in this Count, the Plans suffered tremendous losses. If the Prudence Defendants had discharged their fiduciary duties to prudently invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 131.

132.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Prudence Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 132.

**B.      Count II: Failure to Provide Complete and Accurate Information to Participants and Beneficiaries**

133.     Plaintiff incorporates by reference the allegations above.

**ANSWER:**     Defendants incorporate by reference their foregoing answers and responses to the allegations above.

134.     This Count alleges fiduciary breach against all Defendants (the "Communications Defendants").

**ANSWER:**     The allegations contained in Paragraph 134 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 134.

135.     As alleged above, during the Class Period the Communications Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

**ANSWER:**     The allegations contained in Paragraph 135 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 135.

136.    As alleged above, the scope of the Communications Defendants' duties included disseminating Plan documents and/or Plan-related information to Participants regarding the Plans and/or assets of the Plans.

**ANSWER:**     The allegations contained in Paragraph 136 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 136.

137.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to Participants, not to mislead them regarding their Plans or Plan assets, and to disclose information that Participants need in order to exercise their rights and protect their interests under the Plans. This duty to inform Participants includes an obligation to provide Participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plans' investment options such that Participants can make informed decisions with regard to investment options available under the Plans. This duty applies to all of the Plans' investment options, including investment in Company stock.

**ANSWER:**     The allegations contained in Paragraph 137 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 137.

138.    This fiduciary duty to honestly communicate with Participants is designed not merely to inform Participants and beneficiaries of conduct, including illegal conduct, bearing on their retirement savings, but also to forestall such illegal conduct in the first instance. By failing to discharge their disclosure duties, the Communications Defendants facilitated the illegal conduct in the first instance.

**ANSWER:**     The allegations contained in the first sentence of Paragraph 138 are legal conclusions to which no response is required.   Defendants deny the remaining allegations contained in Paragraph 138.

139.    The Communications Defendants were obligated to provide Participants with complete and accurate information concerning the Plans and all of the Plans' assets. However, their duties of honest disclosure were especially significant with respect to Company stock because: a) during the Class Period, a large percentage of the Plans' assets were invested in it; b) company stock, and in particular Company stock, is and was a particularly risky and volatile investment, even in the absence of company misconduct; and c) Participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock investment.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 139.

140.    The Communications Defendants breached their ERISA duty to inform Participants by failing to provide complete and accurate information regarding the Company and Company stock as alleged above, and, generally, by conveying through statements and omissions inaccurate information regarding the soundness of Company stock, and the prudence of investing retirement contributions in the stock.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 140.

141.    In particular, the Committee Defendants were responsible for communications made in the official documents and materials of the Plans which were disseminated directly to all participants to be used by participants in the management of the investment of their accounts in the Fund, including the SPD, which, on information and belief, incorporated by reference the Company's materially misleading and inaccurate SEC filings and reports.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 141.

142.    These failures were particularly devastating to the Plans and the Participants, as a significant percentage of the Plans' assets were invested in Company stock during the Class Period, with acquisitions of Company stock occurring at significantly inflated prices. Thus, the stock's precipitous decline had an enormous impact on the value of Participants' retirement assets. Had such disclosures been made to Participants, or the Plans' fiduciaries, if any, who were not aware of facts alleged herein, Participants and fiduciaries could have taken action to protect the Plans, and the disclosure to Participants, which necessarily would have been accompanied by disclosure to the market, would have assured that any further acquisitions of Company stock by the Plans would have occurred at an appropriate price.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 142.

143.    As a consequence of the failure of the Communications Defendants to satisfy their duty to provide complete and accurate information under ERISA, Participants lacked sufficient information to make informed choices regarding investment of their retirement savings in Company stock, or to appreciate that under the circumstances known or that should have been known to the Communications Defendants, but not known by Participants, Company stock was an inherently unsuitable and inappropriate investment option for their accounts.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 143.

144.   The Communications Defendants' failure to provide complete and accurate information regarding Company stock was uniform and Plans-wide, and impacted all Participants of the Plans the same way in that none of the Participants received crucial, material information regarding the risks of Company stock as an investment option and all of the Plans' acquisitions of employer stock during the Class Period occurred at inflated prices.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 144.

145.   As a consequence of the Communications Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses. If the Communications Defendants had discharged their fiduciary duties to prudently disclose material information, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly Plaintiff and the other Class members, lost millions of dollars of retirement savings.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 145.

146.   Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Communications Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 146.

### C.   Count III: Failure to Monitor Fiduciaries

147.   Plaintiff incorporates by reference the allegations above.

**ANSWER:**   Defendants incorporate by reference their foregoing answers and responses to the allegations above.

148.   This Count alleges fiduciary breach against Defendant Moore (the "Monitoring Defendant").

**ANSWER:**   The allegations contained in Paragraph 148 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 148.

149.   As alleged above, upon information and belief, during the Class Period the Monitoring Defendant was a de facto fiduciary within the meaning of ERISA § 3(21)(A), 29

U.S.C. § 1002(21)(A). Thus, he was bound by the duties of loyalty, exclusive purpose, and prudence.

   **ANSWER:** Defendants deny the allegations contained in Paragraph 149.

   150. As alleged above, the scope of the fiduciary responsibilities of Defendant Moore included the responsibility to appoint, remove, and, thus, monitor the performance of the members of the Committee, including Defendant Kaufman.

   **ANSWER:** Defendants deny the allegations contained in Paragraph 150.

   151. Under ERISA, a monitoring fiduciary must ensure that monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of a plan's assets, and must take prompt and effective action to protect the plan and participants when they are not.

   **ANSWER:** The allegations contained in Paragraph 151 are legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny the allegations contained in Paragraph 151.

   152. The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to the plan's participants or for deciding whether to retain or remove them.

   **ANSWER:** The allegations contained in Paragraph 152 are legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny the allegations contained in Paragraph 152.

   153. Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan's assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

**ANSWER:**    The allegations contained in Paragraph 153 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 153.

154.    Defendant Moore breached his fiduciary monitoring duties by, among other things:

    (a)    failing, at least with respect to the Plans' investment in Company stock, to properly monitor his appointee(s), to properly evaluate their performance, or to have any proper system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of appointees' imprudent actions and inaction with respect to Company stock;

    (b)    failing to ensure that the monitored fiduciaries appreciated the true extent of Company's inappropriate business practices, and the likely impact of such practices on the value of the Plans' investment in Company stock;

    (c)    to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plans' assets and, in particular, the Plans' investment in the Fund; and

    (d)    failing to remove appointees whose performance was inadequate in that they continued to permit the Plans to make and maintain investments in the Fund despite the practices that rendered Company stock an imprudent investment during the Class Period.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 154.

155.    As a consequence of Moore's breaches of fiduciary duty, the Plans suffered tremendous losses. If Moore had discharged his fiduciary monitoring duties as described above, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans and indirectly Plaintiff and the other Class members, lost millions of dollars of retirement savings.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 155.

156.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), Moore is liable to restore the losses to the Plans caused by his breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 156.

**D.**     **Count IV: Co-Fiduciary Liability**

157.     Plaintiffs incorporate by reference the allegations above.

**ANSWER:**     Defendants incorporate by reference their foregoing answers and responses to the allegations above.

158.     This Count alleges co-fiduciary liability against all Defendants (the "Co-Fiduciary Defendants").

**ANSWER:**     The allegations contained in Paragraph 158 are legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny the allegations contained in Paragraph 158.

159.     As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

**ANSWER:**     The allegations contained in Paragraph 159 are legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny the allegations contained in Paragraph 159.

160.     As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Co-Fiduciary Defendants breached all three provisions.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 160.

161.     Knowledge of a Breach and Failure to Remedy. ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. Upon information and belief, each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches. In particular, they did not communicate their knowledge of the Company's improper activity to the other fiduciaries.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 161.

162.    In particular, because Moore knew of the Company's failures and inappropriate business practices, he also knew that the Prudence Defendants were breaching their duties by continuing to invest in Company stock. Yet, he failed to undertake any effort to remedy these breaches and, instead, compounded them by downplaying the significance of the Company's failed and inappropriate business practices and obfuscating the risk that the practices posed to the Company, and, thus, to the Plans.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 162.

163.    Knowing Participation in a Breach. ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Moore knowingly participated in the breaches of the Prudence Defendants because, as alleged above, he had actual knowledge of the facts that rendered Company stock an imprudent retirement investment and, yet, ignoring his oversight responsibilities, permitted the Prudence Defendants to breach their duties. Moreover, as alleged above, each of the Defendants participated in the management of the Plans' improper investment in the Fund and, upon information and belief, knowingly participated in the improper management of that investment by the other Defendants.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 163.

164.    Enabling a Breach. ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

**ANSWER:**    The allegations contained in Paragraph 164 are legal conclusions to which no response is required.    To the extent that a response is required, Defendants deny the allegations contained in Paragraph 164.

165.    Moore's failure to monitor the Prudence Defendants enabled those Defendants to breach their duties.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 165.

166.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other Participants and beneficiaries, lost millions of dollars of retirement savings.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 166.

167.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 167.

## CAUSATION

168.     The Plans suffered millions of dollars in losses of vested benefits because substantial assets of the Plans were imprudently invested or allowed to be invested by Defendants in the Fund during the Class Period in breach of Defendants' fiduciary duties.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 168.

169.     Had the Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, eliminating Company stock as an investment alternative when it became imprudent, and divesting the Plans of Company stock when maintaining such an investment became imprudent, the Plans would have avoided some or all of the losses that they suffered.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 169.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

170.     The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above and, therefore, knew or should have known that the Plans' assets should not have been invested in the Fund during the Class Period.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 170.

171.     As a consequence of the Defendants' breaches, the Plans suffered a significant loss of vested benefits.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 171.

172.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary…who breaches any of the…duties imposed upon fiduciaries…to make good to such plan any losses to the plan….". Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate….".

**ANSWER:**   The allegations contained in Paragraph 172 are legal conclusions to which no response is required.   To the extent that a response is required, Defendants deny the allegations contained in Paragraph 172.

173.   Plaintiff and the Class and the Plans are therefore entitled to relief from Defendants in the form of:

(a)   a monetary payment to the Plans to make good to the Plans the loss of vested benefits to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a);

(b)   injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3);

(c)   reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law;

(d)   taxable costs and interest on these amounts, as provided by law; and

(e)   such other legal or equitable relief as may be just and proper, including certification of a class in the event such is deemed required.

**ANSWER:**   Defendants deny the allegations and request for relief contained in Paragraph 173.

## JURY DEMAND

Defendants deny that Plaintiffs are entitled to a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for:

A   A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Plans and participants;

B.   An Order compelling Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including loss of vested benefits to the Plans resulting from imprudent investment of the Plans' assets; to restore to the Plans all profits the Defendants made through use of the

Plans' assets; and to restore to the Plans all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

C.     Imposition of a constructive trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

D.     An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

E.     An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plans' investment in Company stock;

F.     Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.     An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

I.     An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants, including class certification if deemed necessary.

**ANSWER:**     Defendants deny that Plaintiffs and the purported Class are entitled to any judgment in their favor or to any of the relief requested.

## **GENERAL DENIAL**

Except as otherwise expressly recognized above, Defendants deny each and every allegation contained in paragraphs 1 through 173, including, without limitation the headings and subheadings contained in the Amended Complaint, and specifically deny any liability to Plaintiffs or any members of the class Plaintiffs purport to represent.  Pursuant to Rule 8(b) of the Federal Rules of Civil Procedure, averments in the Amended Complaint to which no responsive pleading is required shall be deemed denied.  Defendants expressly reserve the right to amend and/or supplement their Answer.

## AFFIRMATIVE AND OTHER DEFENSES

The statement of any defense hereinafter does not assume the burden of proof for any issue as to which applicable law places the burden upon Plaintiffs.  Defendants expressly reserve the right to amend and/or supplement their defenses.  As separate and distinct affirmative defenses to the claims asserted in the Amended Complaint, the Defendants allege, on information and belief, as follows:

### FIRST DEFENSE

Defendant Patrick J. Moore is not a proper party to this lawsuit and should be dismissed from this action.

### SECOND DEFENSE

Plaintiffs' Amended Complaint fails to state a claim upon which relief can be granted.

### THIRD DEFENSE

Plaintiffs' claims are barred by estoppel, waiver, acquiescence, and/or ratification.

### FOURTH DEFENSE

Any losses alleged by Plaintiffs were not caused by any alleged breaches of fiduciary duty by the Defendants, but resulted from economic causes and events not related to any such breaches of fiduciary duty and from matters over which Defendants had no control.

### FIFTH DEFENSE

Any alleged injury suffered by Plaintiffs was in no way caused by, or a result of, any fault, act or omission by Defendants, but was caused by circumstances, persons or entities for which Defendants are not responsible, including Plaintiffs, and for which Defendants cannot be held liable.

## SIXTH DEFENSE

In the event that Plaintiffs have otherwise stated any claim or cause of action, which is specifically denied, Defendants aver that Plaintiffs have failed to mitigate any and all losses or damages claimed by them.

## SEVENTH DEFENSE

Defendants are exculpated, in whole or in part, from the liability asserted in the Amended Complaint by § 404(c) of ERISA, 29 U.S.C. § 1104(c).

## EIGHTH DEFENSE

Plaintiffs lack standing to bring this action on behalf of the Plans under §§ 502(a)(2) and 409 of ERISA, 29 U.S.C. §§ 1109 and 1132(a)(2).

## NINTH DEFENSE

Plaintiffs may not assert their claims on behalf of the Plans under §§ 502(a)(2) and 409 of ERISA, 29 U.S.C. §§ 1109 and 1132(a)(2).

## TENTH DEFENSE

Plaintiffs' claimed relief does not constitute "appropriate equitable relief" under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).

## ELEVENTH DEFENSE

Defendants were not performing a fiduciary function under § 3(21) of ERISA, 29 U.S.C. § 1002(21) regarding the alleged conduct at issue in the Amended Complaint.

## TWELFTH DEFENSE

Individual ERISA defendants are protected from liability by § 409(b) of ERISA, 29 U.S.C. § 1109(b), to the extent that the alleged fiduciary breaches in the Amended Complaint occurred before or after they were alleged fiduciaries.

## THIRTEENTH DEFENSE

Plaintiffs' attempt to use ERISA fiduciary duties to expand the disclosure obligations under the federal securities laws and/or to impose liability arising out of or related to disclosures made or disseminated under the federal securities laws is barred by § 5149(d) of ERISA, 29 U.S.C. § 1144(d).

## FOURTEENTH DEFENSE

Plaintiffs' claims are barred in whole or in part by the applicable statute of limitations, § 413 of ERISA, 29 U.S.C. § 1113 and/or by the equitable doctrines of laches, unclean hands and/or unjust enrichment.

## FIFTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs exercised independent control, discretion and/or authority over their Plan accounts.

## SIXTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, due to Defendants' compliance with ERISA § 403(a)(1), 29 U.S.C. § 1103(a)(1).

## SEVENTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrines of release, waiver, payment and/or accord and satisfaction.

## EIGHTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by assumption of the risk.

## NINETEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, for failure to establish any loss, direct or proximate causation as to any claims alleged.

### TWENTIETH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by Plaintiffs' failure to exhaust administrative remedies provided under the Plans.

### TWENTY-FIRST DEFENSE

Defendants are not liable for each of the others' acts as alleged co-fiduciaries under the governing ERISA laws.

### TWENTY-SECOND DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the appointment of an independent fiduciary.

### TWENTY-THIRD DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have not and cannot overcome the presumptions of reasonableness and/or prudence.

### TWENTY-FOURTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by discharge in bankruptcy.

### TWENTY-FIFTH DEFENSE

Plaintiffs' claims asserted in the Amended Complaint are not suitable for certification as a class action, let alone a nationwide class action, because, among other things, common issues of fact and law do not predominate, there is no community of interest among the alleged potential class members, the putative class cannot be readily ascertained, a class action is not the superior method for proceeding with the claims against Defendants, and proceeding as a class action would be unwieldy and unduly burdensome to the parties and the Court.

## **TWENTY-SIXTH DEFENSE**

Defendants reserve the right to amend their affirmative defenses or assert additional defenses if and to the extent that such amendments or new defenses become apparent or applicable, and to amend their Answer accordingly.

WHEREFORE, Defendants Administrative Committee of the Smurfit-Stone Container Corporation Retirement Plans, Patrick J. Moore, Paul K. Kaufman, Charles Hinrichs, Ron Hackney, and Brian Gardner respectfully request: (a) that no class be certified in this matter; (b) that judgment be entered in their favor and against Plaintiffs Mark W. Mayer, Larry C. Welsh, and Brandi Young; (c) that Plaintiffs' Amended Complaint be dismissed in its entirety with prejudice; and (d) that the Court provide such other and further relief to Defendants Administrative Committee of the Smurfit-Stone Container Corporation Retirement Plans, Patrick J. Moore, Paul K. Kaufman, Charles Hinrichs, Ron Hackney, and Brian Gardner as it deems just and proper.

DATED: September 14, 2009

Respectfully submitted,

By: /s/ R. Mark McCareins
R. Mark McCareins
Michael P. Roche
James F. Herbison
**WINSTON & STRAWN LLP**
35 W. Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
rmccareins@winston.com
mroche@winston.com
jherbison@winston.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney for Defendants Administrative Committee of the Smurfit-Stone Container Corporation Retirement Plans, Patrick J. Moore, Paul K. Kaufman, Charles Hinrichs, Ron Hackney, and Brian Gardner, hereby certifies that a copy of the foregoing DEFENDANTS' ANSWER TO PLAINTIFFS' AMENDED COMPLAINT was served on September 14, 2009 on the following counsel using the CM/ECF system:

Robert A. Izard
William Bernarduci
Wayne T. Boulton
**IZARD NOBEL LLP**
29 So. Main St., Suite 215
West Hartford, CT 06107
Telephone: (860) 493-6292
Facsimile: (860) 493-6290

Charles R. Watkins
John R. Wylie
William W. Thomas
**FUTTERMAN HOWARD WATKINS**
    **WYLIE & ASHLEY, CHTD.**
122 S. Michigan Ave., Suite 1850
Chicago, IL  60603
Telephone: (312) 427-3600
Facsimile:  (312) 427-1850

Major Khan
**MAJOR KHAN LLC**
20 Bellevue Terrace
Weehawken, NJ 07086
Telephone: (646) 546-5664
Facsimile (646) 546-5755

Dated:  September 14, 2009

/s/ James F. Herbison
_____

R. Mark McCareins
Michael P. Roche
James F. Herbison
**WINSTON & STRAWN LLP**
35 W. Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
rmccareins@winston.com
mroche@winston.com
jherbison@winston.com

*Attorneys for Defendants*